Mildred Lea LINTON, by her next friend Kathy ARNOLD, on her own behalf and on behalf of all other persons similarly situated, Plaintiff–Appellee,

Belle Carney, by her next friend Mary Kimble, on her own behalf and on behalf of all other persons similarly situated, Plaintiff/Intervenor–Appellee,

v.

COMMISSIONER OF HEALTH AND ENVIRONMENT, STATE OF TENNESSEE, Defendant–Appellee,

St. Peter Villa, Inc. (93–6142); Presbyterian Homes of Tennessee, Inc. (93–6143); RHA/Sullivan, Inc. (93–6144); Cedars Health Care Center, Inc. (93–6146); McKendree Village, Inc. (93–6147), Defendants/Intervenors-Appellants.

Nos. 93–6142 to 93–6144, 93–6146 and 93–6147.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 3, 1995.

Decided Sept. 15, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 23, 1995.

Gordon Bonnyman (briefed and argued), Legal Services of Middle Tennessee, Inc., Nashville, TN, for Mildred Lea Linton, Belle Carney.

Jennifer Helton Small, Asst. Atty. Gen. (argued), Office of the Attorney General, General Civil Division, Nashville, TN, for Commissioner of Health and Environment, State of Tenn.

Joel M. Hamme (briefed), Joseph W. Metro (briefed), Reed, Smith, Shaw & McClay, Washington, DC, William M. Barrick (argued and briefed), Nashville, TN, for St. Peter Villa, Inc., Presbyterian Homes of Tennessee, Inc., RHA/Sullivan Inc., Brook Meade Health Care Center, Inc., Cedars Health Care Center, Inc., McKendree Village, Inc.

Before: JONES, GUY, and BOGGS, Circuit Judges.

RALPH B. GUY, Jr., Senior Circuit Judge.

This case involves a class action suit brought in 1987 against the Commissioner of the Tennessee Department of Health and Environment (Tennessee).[1] The plaintiffs

---

1. At different times during the period relevant to this case, the agency was also known as the Department of Public Health. It is currently titled the Department of Health. For convenience, it is referred to throughout this opinion as "Tennessee."

are current or future Medicaid-eligible individuals who seek nursing facility services.[2] Plaintiffs contested the validity of Tennessee's implementation of distinct part certification under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (Medicaid Act).[3] Under distinct part certification, a provider of a skilled nursing facility (SNF) could certify a distinct part of a facility (e.g., a wing, one side of a corridor, a floor) for Medicaid participation, for patients requiring a different level of care.[4] As part of distinct part certification, Tennessee allowed skilled nursing facilities, at their discretion, to "spot" certify beds for Medicaid participation. This practice allowed fewer than all beds within a particular wing or floor to be available for Medicaid recipients regardless of their required level of care. In addition, Tennessee allowed facilities to certify as Medicaid beds fewer than all beds available for residents residing in intermediate care facilities. These practices shall be referred to as the "limited bed policy." Twenty-three percent of Tennessee's Medicaid-participating nursing homes chose to have Tennessee certify beds under the limited bed policy. Under this policy, seven percent of the total beds in Medicaid-participating facilities, which would otherwise have been certified, went uncertified.

Plaintiff, Mildred Linton, receives Medicaid assistance and is severely disabled from rheumatoid arthritis. At the time this lawsuit was commenced, she was receiving an SNF level of care at the Green Valley Health Care Center, a Tennessee nursing facility. In 1986, Medicaid officials, reviewing her medical record, determined that she no longer required such a high level of care and informed her that they were reducing her care eligibility to intermediate. Green Valley, under distinct part certification, had 87 intermediate care facility (ICF) beds. Under Tennessee's limited bed policy, however, it had apportioned only 40 of those beds as ICF Medicaid beds. Green Valley informed Linton that it intended to decertify her Medicaid bed and, due to a considerable waiting list for ICF Medicaid beds, would not likely have available any ICF Medicaid beds.[5] The facility's action, as condoned under Tennessee's limited bed policy, would force Linton to leave the nursing home where she had lived for four years and which was located close to her family, with no assurance that a Medicaid bed would be available for her elsewhere.

Plaintiff-intervenor, Belle Carney, age 89 at the time this suit was filed, suffers from Alzheimer's disease. In 1987, she was hospitalized for two weeks and was to be discharged to a nursing home. Carney, who is eligible for Medicaid and is black, had difficulty finding a Medicaid bed. In the interim, she was shunted among a series of inadequate and unlicensed facilities.

Plaintiffs alleged under 42 U.S.C. § 1983 that Tennessee's limited bed policy violated

---

2. The certified class consists of the following persons:

> [A]ll persons who are now, or will in the future be, eligible for medical assistance benefits under the Tennessee Medicaid program, pursuant to Title XIX of the Social Security Act, and who seek nursing home care in an intermediate care facility (ICF) or skilled nursing facility (SNF) certified as eligible to participate in the Tennessee Medicaid program.

3. Medicaid is a joint state-federal funding program for medical assistance for the needy in which the federal government approves a state plan for the funding of medical services and then subsidizes a significant portion of the financial obligations the state has agreed to assume. Once a state chooses to participate in Medicaid, the state must comply with the statute's requirements, including regulations. *See Alexander v. Choate,* 469 U.S. 287, 289 n. 1, 105 S.Ct. 712, 714 n. 1, 83 L.Ed.2d 661 (1985). In Tennessee, the federal government funds approximately 70 percent of these obligations. Payments are made by the Health Care Financing Administration (HCFA) of the federal Department of Health and Human Services. The Tennessee Department of Health and Environment is responsible for administering Tennessee's Medicaid program.

4. At the time this action was brought, facilities were classified as skilled nursing facilities or intermediate care facilities, depending on the degree of care provided, with the former involving a higher degree of care. In 1987, Congress eliminated these distinctions and created a single category of "nursing facilities," effective October 1, 1990. *See* 42 U.S.C. § 1396r(a).

5. In contrast, at the time, private-paying ICF patients were allowed to compete for any ICF bed in a facility regardless of whether the bed was Medicaid-certified and thus had a shorter wait before placement in an ICF bed.

the Medicaid Act. Plaintiffs raised several challenges under the Medicaid Act, including the claim that Tennessee's limited bed policy did not meet federal distinct part standards. They also alleged that the policy had a disparate impact on black class members in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (Title VI), and its implementing regulations.

The district court, setting forth findings of fact and conclusions of law, pursuant to Fed. R.Civ.P. 52, found that Tennessee's limited bed policy violated distinct part certification standards and other provisions of the Medicaid Act. The court indicated that the purpose of distinct part certification was to accommodate the delivery of qualitatively different types of health care within the same facility. Tennessee's limited bed policy, in contrast, served "the interests of nursing homes who wish to participate in the Medicaid program while also maintaining a separate private pay facility offering the same type of care." Violations of distinct part certification standards included certification even when a facility did not house all ICF residents in the certified portion of the institution. Moreover, Tennessee certified beds under distinct part standards even when no separately administered unit of a facility existed at all. HCFA in interpreting the distinct part certification provision had expressly advised that spot certification did not satisfy distinct part certification: "'Various beds scattered throughout the institution would not comprise a unit operated distinguishably'" for certification purposes. The court also found that the limited bed policy violated Title VI.

As a result of its liability determinations, the court instructed Tennessee to submit a remedial plan, including prophylactic measures to prevent or mitigate Medicaid provider attrition. Heightened attrition by Medicaid providers was of acute concern to the district court. Previously, the court had denied plaintiffs' request to enjoin preliminarily Tennessee's limited bed policy because the court found that granting relief would cause substantial harm to the plaintiffs: some providers would opt out of the Medicaid program and traumatize their Medicaid patients

who, as a result of discontinuation of services, would be transferred away from families or discharged to inadequate alternative care. In response to the district court's instruction, Tennessee proposed a plan that it had negotiated with plaintiffs. The four-part remedial plan consisted of two introductory parts, followed by two substantive parts addressing the laws found to have been violated, the Medicaid Act and Title VI. The Medicaid Act remedies were included in Part III, entitled "Plan Regarding Distinct Part Certification." That part required Medicaid providers to certify all available, licensed nursing home beds within their facilities ("full certification") and to admit residents on a first-come, first-serve basis; prohibited involuntary transfer or discharge based upon source of payment; and adopted procedures for provider withdrawal from the program, including patient protection and disincentives to discourage provider attrition. Providers who chose to withdraw from the system were required to retain current Medicaid patients and comply with Medicaid requirements as to such patients (the so-called "lock-in" requirement). Providers who withdrew would be excluded from Medicaid participation for two years after withdrawal (the so-called "lock-out" requirement). Part IV addressed Title VI violations and was entitled "Defendant's Plan to Redress the Finding of Unintended Disparate Impact on Minorities' Access to Nursing Homes." Its remedies included draft rules for Title VI civil rights compliance and enforcement, added staff to Tennessee's Office of Civil Rights Compliance, and incorporated by reference the measures adopted in Part III of the plan. The district court adopted the plan without amendment.

On July 30, 1990, 25 days after the district court had entered final judgment in this action, defendant-intervenors pursuant to Fed. R.Civ.P. 24 filed a motion to intervene for purposes of appeal. Defendant-intervenors are five licensed nursing homes in Tennessee. Only defendant-intervenor RHA/Sullivan, Inc., certified fewer than all of its patient beds under the Medicaid Act. The others certified all of their patient beds, however, they prefer private-paying residents over Medicaid recipients as patients, and therefore are impacted by the remedies

adopted, including the lock-in provision. *See Linton v. Commissioner of Health & Env't*, 973 F.2d 1311, 1318 n. 12 (6th Cir.1992). Defendant-intervenors sought to intervene in this action because they want to allot beds occupied by Medicaid residents to non-Medicaid residents financially capable of paying higher occupancy rates. *See id.* at 1317. The district court denied their motion as untimely and determined they lacked standing.

On appeal, we reversed. *Id.* Plaintiffs and Tennessee then moved to modify the mandatory lock-in provision by replacing it with an optional one, which motion the court granted. In addition, the lock-out provision has been revised to allow the state to waive this provision when contracting with a former provider would otherwise serve the interests of the remedial plan. The district court then granted defendant-intervenors' motion to intervene and docketed their notices of appeal *nunc pro tunc.*[6] Plaintiffs and Tennessee, however, moved to dismiss defendant-intervenors' appeal in light of the modifications made to the remedial plan. We denied that motion and held that defendant-intervenors could pursue appellate review of the remedial plan. *Linton v. Commissioner of Health & Env't*, 30 F.3d 55, 57 (6th Cir.1994).

## I.

In their appeal on the merits, defendant-intervenors raise two issues: (1) the district court's factual finding of disparate impact in violation of Title VI was clearly erroneous; and (2) the district court abused its discretion in granting the relief that it did.

Defendant-intervenors do not challenge the district court's findings regarding violations of the Medicaid Act and its implementing regulations. *See* defendant-intervenors' br. at 7 ("Although the district court found that both the Tennessee Certification Policy did not meet federal distinct part standards and made conclusory holdings with respect to a number of plaintiffs' other Medicaid Act claims ... only plaintiffs' Title VI claims—and the relief the district court ordered with

respect to those claims—are at issue in this appeal.")

The district court's Medicaid Act rulings were the subject of previous litigation, however. The Tennessee Health Care Association (THCA), which participated as amicus curiae at the district court level in this case and which has obtained financing and legal assistance from the American Health Care Association and employed an attorney for the purpose of representing the defendant-intervenors, *see* 973 F.2d at 1316, brought a separate action under the Medicaid Act against defendant, seeking to compel defendant to file the *Linton* remedial plan with the Health Care Financing Administration for HCFA's approval. *See* 42 C.F.R. § 430.12(c) (material changes in state policy must be submitted to HCFA for review).

On January 24, 1991, THCA received a letter from the regional administrator of HCFA Region IV, who is authorized to approve Medicaid state plan amendments. *See* 42 C.F.R. § 430.15(b). That letter stated that HCFA had reviewed the *Linton* plan and concluded that no formal state plan amendment was required and that the "*Linton* plan was consistent with federal requirements." *Tennessee Health Care Ass'n v. Commissioner, Tenn. Dep't of Health & Env't*, Nos. 91–5789; 91–6220, 1992 WL 36217, at *1 (6th Cir. Feb. 26, 1992). In light of this informal approval, THCA sought and was granted dismissal of its action with prejudice. *Id.*

Defendant-intervenors' appeal challenges the breadth of some of the remedies adopted by the court under Part III of the remedial plan. Rather than dispute the validity of the district court's determination that the Medicaid Act has been violated, however, defendant-intervenors only appeal the district court's disparate impact finding under Title VI as an improper predicate for these remedies. Defendant-intervenors do not claim, however, that no legal predicate exists for these remedies, rather, they simply argue that because the disparate impact finding under Title VI was erroneous, the "underly-

6. One of the original intervenors, Brook Meade Health Care Center, Inc., was voluntarily dismissed by stipulation due to pending bankruptcy proceedings.

ing legal predicate for the Court's actions would be *altered.*" Defendant-intervenors' br. at 42 (emphasis added). It is beyond peradventure, however, that "if the judgment of the lower court is correct for any reason, it will be affirmed." *Paine & Williams Co. v. Baldwin Rubber Co.*, 113 F.2d 840, 844 (6th Cir.1940). In this case, all of the remedies challenged on appeal appear in Part III of the plan. None of these remedies are predicated on a finding of a Title VI violation, alone. At most, they are all incorporated by reference within Part IV, which incorporates by reference Part III of the plan. Therefore, we consider whether the remaining unchallenged legal predicate for the remedies disputed on appeal, the Medicaid Act, is sufficient to uphold the breadth of the remedies disputed on appeal. If so, we need not reach the merits of defendant-intervenors' challenge to the disparate impact finding, as it would have no bearing on the result sought by defendant-intervenors: to vacate the remedial plan and remand for narrower remedies for Medicaid Act violations imposed under Part III of the remedial plan.

### A. The Remedial Plan

#### 1. Conformance with the Medicaid Act

Defendant-intervenors argue that this court should vacate the remedial plan and remand this case because the district court abused its discretion by exceeding its authority in imposing an overbroad remedy. *See United States v. City of Parma*, 661 F.2d 562, 576 (6th Cir.1981) ("courts must carefully tailor the remedy in cases of statutory violations, limiting it to relief necessary to correct the violations"), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982). In *Parma*, we reviewed a remedial plan imposed by the district court for violations of the Fair Housing Act. In considering the plan, we addressed a district court's power to grant relief necessary to correct statutory violations:

> The breadth of the remedial order does not, in itself, indicate that a court has exceeded its authority. As Chief Justice Burger wrote for the Supreme Court in *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971):
>
>> Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.
>>
>> The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims [quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944)].

661 F.2d at 576.

We apply the same considerations here. Unlike the parties in *Parma*, however, plaintiffs and defendant in this case negotiated the remedy entered by the district court. In reviewing a consent remedy, we consider whether the remedy "conflicts with or violates the statute upon which the complaint was based" or violates the intervenors' constitutional rights. *See Local 93, International Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 526, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986). A consent remedy, like a court-imposed remedy, is also reviewed for abuse of discretion. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 389, 112 S.Ct. 748, 762–63, 116 L.Ed.2d 867 (1992). Under that standard, we must reverse if we are firmly convinced that a mistake has been made. *E.g., Miller's Bottled Gas, Inc. v. Borg–Warner Corp.*, 56 F.3d 726, 734 (6th Cir.1995).

Defendant-intervenors do not dispute the validity of the remedial plan's full certification requirement as a remedy for the Medicaid Act violations found. They contend rather that the procedures adopted to implement that requirement are overbroad, challenging, specifically, the plan's requirements that (1) Medicaid providers adopt a "first-come, first-served admissions" policy with limited excep-

tions that no longer include an exception based on source of payment for services (i.e., preference for private-paying patients); (2) providers who opt out of Medicaid participation must continue to serve existing Medicaid patients in compliance with the Medicaid Act; (3) impose a two-year moratorium on future participation by those providers who have chosen to withdraw; and (4) require providers to notify patients that they are withdrawing.

### a. First-Come, First–Serve Requirement

■ We initially address the propriety of the first-come, first-serve admission requirement. Defendant-intervenors, without more, claim that this requirement is overbroad. We disagree. The record shows there are more applicants than there are nursing facility beds. The first-come, first-serve policy limits preferences among applicants to those based on medical needs. Defendant-intervenors argue that the rule unnecessarily precludes an exception for private-pay preference. Such an exception would swallow the rule, however. Under such an exception, providers could provide even fewer beds for Medicaid patients than they did under the limited bed policy.

### b. "Lock-in" Requirement

■ We next consider defendant-intervenors' attack on the plan's "lock-in" or continued service provision, which they contend violates the Medicaid Act. Under this provision, current Medicaid patients are allowed to remain in a nursing facility that chooses to withdraw from the Medicaid system. This provision was adopted as an interim measure to mitigate patient transfer trauma and to minimize involuntary transfer and discharge of Medicaid patients by providers withdrawing from the system. Defendant-intervenors contend that this feature impermissibly interferes with their business decision to favor higher paying private-pay patients and contravenes the voluntary nature of provider participation in Medicaid. The only statutory authority cited in support of their argument, however, is 42 U.S.C. § 1396a(a)(30)(A), which states that a state Medicaid plan must provide payments "sufficient to enlist enough providers so that care and services are available under the plan." That provision is irrelevant here as the adequacy of Medicaid reimbursements is not at issue in this case. The continued service provision merely addresses the availability of continued service for Medicaid residents in facilities that are withdrawing from the Medicaid system. It does not address the general availability of Medicaid providers.

A review of the Medicaid Act's provisions in pertinent part suggests that defendant-intervenors' argument is without merit. The Medicaid program through its contract system is predicated upon provider compliance with the Medicaid Act in exchange for compensation. Under the Act, "any individual eligible for medical assistance ... may obtain such assistance from any [provider] who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23). Regulation of such services includes prohibitions on improper transfers. See 42 U.S.C. § 1396r(c)(2)(A) (facilities must allow a resident to remain in the facility and may not transfer or discharge the resident from the facility unless the resident's needs cannot be met or the resident's health or safety is endangered, the resident has failed to make proper payments to the facility, or the "facility ceases to operate"). Even when a resident has failed to make payment, contractors must continue to provide care pending an opportunity for administrative review regarding funding. See 42 U.S.C. § 1396r(c)(2)(A)–(C). Tennessee regulations bar involuntary transfer of even non-paying patients when necessary to prevent "traumatic effect on the patient." Tenn. Dep't of Health and Env't R. 1200–8–6–.02(7)(d).

Nowhere does the Medicaid Act permit involuntary transfer on the basis that a facility chooses to withdraw from the Medicaid program because it thinks it can make more money serving private patients. A nursing facility is required to "establish and maintain identical policies and practices regarding transfer, discharge, and the provision of services required under the State plan for all individuals regardless of source of payment." 42 U.S.C. § 1396r(c)(4). Similarly, admission

decisions may not be based upon eligibility or future eligibility under Medicaid. *See* 42 U.S.C. § 1396r(c)(5). As the district court recognized, full certification in undiluted form would likely prompt certain providers to withdraw from the Medicaid system. Thus we find the continued service provision is an appropriate interim measure to mitigate the harmful effect of that consequence and consistent with the Medicaid Act.[7]

### c. "Lock–Out" Requirement

■ We next address the propriety of the so called "lock-out" or moratorium provision. That provision dictates that Tennessee will not contract for a period of two years with facilities that have terminated their Medicaid agreements. Defendant-intervenors contend that this provision conflicts with 42 C.F.R. § 442.12, which provides for denial of provider participation for "good cause."[8] Defendant-intervenors further argue that, although the regulation does not define "good cause," we should construe the phrase as limited to fraud and abuse or failure to provide services as required by federal regulations. Section 442.12 is inapposite. That provision applies to certified facilities, Medicaid providers who are about to be involuntarily decertified. *See* 42 C.F.R. § 442.12(d)(1). The moratorium provision, by its very nature, only pertains to providers who have already withdrawn from the system, and now for their own reasons seek re-entry.[9]

Ample reasons exist to justify the moratorium provision. Tennessee imposed the moratorium as a disincentive to providers from withdrawing. The record indicates that a provider's withdrawal from Medicaid can cause discharge trauma to Medicaid nursing home patients, particularly the frail elderly, who may be involuntarily transferred or discharged to facilities away from families or friends. Without this provision, contractors could engage in a de facto limited bed policy, albeit through a revolving door system: enrolling in the Medicaid system long enough to fill the limited capacity desired by the provider and then withdrawing once that capacity had been met (and re-enrolling when the number of Medicaid beds fell below that self-set limit).

### d. Notification of Withdrawal Requirement

■ Defendant-intervenors also challenge the notification of withdrawal requirement, which requires providers to inform Medicaid patients that the providers are withdrawing from the Medicaid system. This requirement is consistent, however, with the law requiring nursing facilities participating in the Medicaid program to apprise patients of their rights. *See* 42 U.S.C. § 1396r(c)(1)(B); 42 C.F.R. § 483.10(b); Tenn.Code Ann. § 68–11–804(c)(2); *id.* at § 68–11–910; Tenn. Dep't of Health and Env't R. 1200–8–6–.02(10)(a).[10]

---

**7.** As noted previously, the plan has been modified to make the mandatory "lock-in" provision voluntary.

**8.** That provision provides that a state Medicaid plan must include that:

(1) If the Medicaid agency has adequate documentation showing good cause, it may refuse to execute an agreement, or may cancel an agreement, with a certified facility.
(2) A provider agreement is not a valid agreement for purposes of this part even though certified by the State survey agency, if the facility fails to meet the civil rights requirements set forth in 45 CFR Parts 80, 84, and 90. 42 C.F.R. § 442.12(d).

**9.** Defendant-intervenors themselves do not argue that section 442.12 is controlling.

**10.** Additionally, we find persuasive plaintiffs' argument that, regardless of this lawsuit, Tennes-

see had the authority under federal and state law to adopt the remedial measures at issue. For example, under the Act, Tennessee must provide "such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19). Considerable deference is provided to states under the Act to decide "eligible groups, types and range of services, payment levels for services, and administrative and operating procedures." 42 C.F.R. § 430.0. In 1987, Congress enacted a series of statutory reforms through the Omnibus Budget Reconciliation Act of 1987. These reforms created additional requirements for nursing facilities, *see generally* 42 U.S.C. § 1396r, including strengthening Medicaid patient rights, 42 U.S.C. § 1396r(c)(1)(A), notification to nursing facility residents of such rights, *id.* at § 1396r(c)(1)(B), prohibitions relat-

## 2. Impairment of Contract

In addition to disputing the plan's conformance with the Medicaid Act, defendant-intervenors also argue that the plan's continued service and moratorium provisions substantially impair defendant-intervenors' contractual relationship with Tennessee. *See* U.S. const. art. I, § 10, cl. 1 ("No State shall ... pass any ... Law impairing the Obligation of Contracts"). In evaluating a claim of contract impairment, the Supreme Court has adopted a three-prong test considering: (1) whether complainant has shown "a substantial impairment" of a contractual relationship; (2) assuming substantial impairment is shown, whether the state has a "significant and legitimate public purpose behind the regulation" alleged to impair the contract, such as the "remedying of a broad and general social or economic problem"; and (3) assuming a legitimate public purpose has been identified, whether adjustment of rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the "public purpose" justifying the legislation's adoption. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12, 103 S.Ct. 697, 704–05, 74 L.Ed.2d 569 (1983). The restrictions of the Contract Clause must be reconciled with the " 'essential attributes of sovereign power,' " which are necessarily reserved by the states to safeguard their citizens. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 21, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977) (quoting *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 435, 54 S.Ct. 231, 239, 78 L.Ed. 413 (1934)).

Applying this analysis, we first consider whether defendant-intervenors have shown a substantial impairment of their Medicaid contracts with Tennessee.[11] Defendant-intervenors claim that the impairment caused by the continued service provision is "substantial if not total." They contend that under that provision they are unable to exercise their contracts' termination clause, which allows them to terminate their Medicaid contract with Tennessee upon 30 days notice, thereby unduly interfering with their "fundamental right of contract termination." Additionally, they argue, the provision makes their agreements' one-year term provision meaningless, and they no longer have the ability to accept or reject changes in federal standards through revocation of the provider agreement. Therefore, they allege, they have lost the voluntariness of the contract. As for the moratorium provision, defendant-intervenors imply that they have been excluded from contracting with the state of Tennessee for the business decision of terminating their contracts.

In addressing whether the continued service provision substantially impairs defendant-intervenors' contracts, we note that the sample contract on which defendant-intervenors rely was executed after final adoption of the *Linton* remedial plan. As a factual matter, therefore, no impairment could have taken place. *See, e.g., Oshkosh Waterworks Co. v. City of Oshkosh*, 187 U.S. 437, 446, 23 S.Ct. 234, 237, 47 L.Ed. 249 (1903) (Contract Clause refers only to state action taken after the making of the contract whose obligation is alleged to have been impaired). As for any previous contracts that may have been in effect at the time that the continued service provision was adopted, we find that rather than undermine the benefit of the bargain of those contracts, the continued service provision gives providers who choose to withdraw from the system an enhanced version of the system in place before any remedy was adopted. Under the continued service provision, these providers may continue to serve a

---

ing to transfers and discharge of residents, *id.* at § 1396r(c)(2); permitting state access to residents for regulatory purposes; *id.* at § 1396r(c)(3); requiring equal access to care for residents "regardless of source of payment," *id.* at § 1396r(c)(4); and protections in admissions of Medicaid recipients, *id.* at § 1396r(c)(5). Moreover, HCFA reviewed and approved the plan. *See Tennessee Health Care Ass'n v. Commissioner, Tenn. Dep't of Health & Env't*, Nos. 91–5789; 91–6220, 1992 WL 36217, at *1 (6th Cir., Feb. 26, 1992). Particular deference is owed to HCFA as the agency in charge of implementing the Medicaid Act.

**11.** Although the actual contracts are not contained in the record, Tennessee, as a party to such contracts, in opposing defendant-intervenors' appeal, does not refute in its statement of facts or otherwise the existence of the contract language and provisions relied on by defendant-intervenors.

limited number of Medicaid participants while reserving all additional beds for private-paying patients as they become available.[12] *See Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704 (state's restriction of a party to gains it reasonably expected from the contract does not necessarily constitute substantial impairment). The continued service provision does not obligate providers to bring in any more Medicaid patients; it merely curtails the impact of patient trauma caused by providers' decision to withdraw from the system.

■■■ The Supreme Court has recognized three components to the inquiry whether a change in state law has " 'operated as a substantial impairment of a contractual relationship.' " *General Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328 (1992) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978)). These include whether (1) a contract exists, (2) a change in law impairs that contract, and (3) the impairment is substantial. 503 U.S. at 186, 112 S.Ct. at 1109. Defendant-intervenors in presenting their argument only address the third component of this inquiry. We find, however, that defendant-intervenors have failed to establish the first two components of the analysis and, therefore, their argument must fail. The sample contract upon which defendant-intervenors rely to establish the existence of their contracts was executed after final adoption of the *Linton* remedial plan. State action cannot impair a contract provision that did not exist at the time the state action occurred. *See id.* at 186–87, 112 S.Ct. at 1109–10 (no contractual agreement existed regarding workers' compensation terms at time of state action). As for any previous contracts that may have been in effect at the time that the continued service provision was adopted, defendant-intervenors have made no showing that they either desired or attempted to terminate those contracts.

■■■ We next address whether the moratorium provision impairs the contractual rela-

tionship between defendant-intervenors and Tennessee. The provision only affects providers who do not have contracts with Tennessee. In that sense, defendant-intervenors' use of the term "lockout" is a misnomer. *Cf.* 42 C.F.R. § 431.54(f) (setting forth notice and opportunity to be heard requirements for participating providers to be locked out for abuse). In general, a state is free to contract with whom it pleases. *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940) ("Like private individuals and businesses, the Government enjoys the unrestricted power to . . . determine those with whom it will deal"). Indeed, Medicaid law requires the state to contract with entities that are "qualified to perform the . . . services required." 42 U.S.C. § 1396a(a)(23). A state does not have to enter into and may rescind a provider contract with an entity that fails to comply with federal law. *See* 42 C.F.R. § 442.12(d)(2).

Even if the continued service and moratorium provisions were to impair defendant-intervenors' contractual relationship with Tennessee, in determining whether such an impairment would be substantial, a court looks to the pervasiveness of the regulation of the industry at issue. *Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704 (" 'When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic' ") (quoting *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38, 60 S.Ct. 792, 795, 84 L.Ed. 1061 (1940)). In this instance, the nursing home industry is a pervasively regulated industry. *See Clay County Manor, Inc. v. Tennessee, Department of Health and Environment*, 849 S.W.2d 755, 760 (Tenn.1993). Defendant-intervenors participate in such an industry as Medicaid providers and were subject to pervasive regulation prior to the elimination of Tennessee's limited bed policy. The magistrate judge's report and recommendation of liability in this case, issued more than two years prior to the district

---

12. Ironically, one of the defendant-intervenors, McKendree Village, Inc., sought and obtained a modification of the continued service rule to expand its protection to residents who became Medicaid-eligible only after McKendree Village had withdrawn from the Medicaid program.

court's adoption of that report and recommendation, in substantial part gave the defendant-intervenors, who acknowledge notice of the pending litigation,[13] notice that changes in the law were likely. Indeed, a 1988 draft of the remedial plan, which was provided to THCA as amicus curiae, contained a version of the lock-in provision. *See* 973 F.2d at 1315. The defendant-intervenors notwithstanding this knowledge renewed their contracts.

Even if the provisions were to substantially impair defendant-intervenors' contracts, our inquiry would not stop there. We would still consider whether the remedial plan were based upon a significant and legitimate public purpose. *Energy Reserves Group,* 459 U.S. at 411, 103 S.Ct. at 704 (state action that substantially impairs a contract can be justified in the presence of "a significant and legitimate public purpose.") Normally, we defer to a state's judgment as to the necessity of a measure in question, *United States Trust,* 431 U.S. at 22–23, 97 S.Ct. at 1517–18, however, when the state is a party to the contract at issue, we must discern whether under the circumstances the state's self-interest renders such deference inappropriate. *Id.* at 26, 97 S.Ct. at 1519–20. Defendant-intervenors characterize Tennessee's involvement in the remedial plan as based upon pecuniary self-interest. Without more, they accuse Tennessee of agreeing to the plan "as a self-serving means of satisfying the district court's desire to prevent provider attrition without having to increase payments to enlist more providers." Defendant-intervenors imply that the violations caused by the limited bed policy could have been remedied by increased payments to entice more providers. This argument, however, is unavailing. First, this was an action brought on behalf of Medicaid-eligible persons, not providers, against Tennessee in its regulatory capacity. The issues raised did not include the reasonableness of provider payments or the need for additional providers but, rather, the legitimacy of Tennessee's policy of certifying pro-

viders as Medicaid providers, while allowing nursing homes to limit artificially the available beds for Medicaid patients.[14]

Moreover, any argument that Tennessee was motivated by a desire to avoid greater state expenditure is belied by Tennessee's actions in this case. The plan reveals that, although not an issue in the litigation, Tennessee increased its Medicaid nursing home reimbursement rates as part of its effort to mitigate provider attrition. The elimination of the limited bed policy in favor of a full certification policy itself seeks to increase the availability of Medicaid beds for Medicaid patients within the system, and thus increase Tennessee's financial obligation under Medicaid. In addition, the policies adopted to further that goal, such as the continued service provision, create further financial obligation on Tennessee by continuing Medicaid payments to providers who choose to withdraw from the system.

Defendant-intervenors characterize the continued service and moratorium provisions as "punitive rather than regulatory." Yet they concede that the provisions apply regardless of a provider's reason for withdrawal. Defendant-intervenors further contend that "if the remedial plan were truly designed to serve [its purpose], it would simply have forbidden withdrawing facilities from engaging in transfers or discharges without proper discharge planning ... rather than a blanket lock-in requirement." Defendant-intervenors' reply br. at 24. This argument seeks to substitute the defendant-intervenors' judgment for the judgment of the state of Tennessee, which judgment we have concluded is not motivated by self-interest and is therefore entitled to deference.

Lastly, we consider whether the plan properly adjusts the rights and responsibilities of the contracting parties. *See* 459 U.S. at 412, 103 S.Ct. at 705. Tennessee has general rulemaking authority pursuant to Tenn.Code Ann. § 68–1–103, as well as authority to effectuate the purposes of Tenn.Code Ann.

**13.** The facilities' state association, the THCA, participated as amicus curiae at the district court level in this case.

**14.** Although we reversed the district court's denial of defendant-intervenors' motion to intervene, we note that the district court in ruling against the motion expressed its concern that the movants were seeking to convert the proceeding into an action challenging the reasonableness of provider payments. *See* 973 F.2d at 1319.

§ 71–5–102 through –106, in implementing the Medicaid Act. Tenn.Code Ann. § 71–5–134. The provisions in the instant case respond to a district court's interpretation of Medicaid law and balance the interests of providers and patients, as third-party beneficiaries to such contracts. In particular, we note that the remedy did not force a provider to serve a single patient with whom it did not already have an existing patient relationship, or for whom the provider would not continue to receive a full Medicaid payment. Nor were these protections extended to any of the Medicaid-eligible patients on the withdrawing contractors' waiting lists.

## B. Disparate Impact Finding

Because we find the remedial plan as disputed on appeal is adequately predicated upon the district court's unchallenged finding that Tennessee's limited bed policy violated the Medicaid Act, we need not address whether the district court erred in finding that the limited bed policy had a disparate impact on blacks.

**AFFIRMED.**