NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0001n.06

No. 13-1476

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JOHN WELCH; KENNETH SPARKS, JR.; JUDITH WELCH; CAROL SPARKS; SHERRY MURPHY; MARK A. FULKS; URGE, | ) ) ) ) | **FILED**<br>Jan 03, 2014<br>DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| MICHAEL BROWN; EDWARD KURTZ; ROBERT ERLENBECK; GERALD AMBROSE; CITY OF FLINT, | ) ) ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Defendants-Appellants. | ) ) ) | **OPINION** |

BEFORE:     DAUGHTREY, COLE, and WHITE, Circuit Judges.

COLE, Circuit Judge.  The limited purpose of this appeal is to determine whether the district court abused its discretion by granting Plaintiffs-Appellees preliminary injunctive relief.  The City of Flint is in financial distress.  Declining property taxes, high unemployment rates, and a decrease in revenue-sharing from the State of Michigan have contributed to the City's chronic budgetary woes.  To stave off municipal insolvency and balance the City's budget, the Governor of Michigan appointed an Emergency Manager to address the financial crisis.  In this appeal, Plaintiffs challenge several orders the Emergency Manager issued, which modified existing contracts and collective bargaining agreements with respect to health-care benefits of municipal retirees.  While the

modifications stand to save the City 3.5 million dollars, the changes also shift out-of-pocket medical expenses to retirees, many of whom live on fixed incomes.

Plaintiffs and the class they represent are individual retired municipal workers, their eligible spouses, dependents, and the United Retired Governmental Employees ("URGE"), an organization that represents the interests of municipal retirees. Seeking injunctive relief and damages under 42 U.S.C. § 1983, Plaintiffs filed a Class Action Complaint against the City of Flint, its current and former Emergency Managers, its Retirement Officer Manager, and its Finance Director (collectively, "Defendants"). According to Plaintiffs, Defendants violated the Contract and Bankruptcy Clauses of the United States Constitution and deprived them of a property interest without due process or just compensation. Plaintiffs requested a preliminary injunction to enjoin Defendants from modifying the contracts and ordinances governing their health-care benefits and to restore any already modified agreements to the status quo ante. Although Defendants argue that reducing retiree benefits is a "necessary change" to avoid bankruptcy, the district court was not persuaded based on the evidence and argument presented. Finding no abuse of discretion, we affirm the district court's order granting preliminary injunctive relief.

## I. BACKGROUND

In 2011, the Michigan legislature passed the Local Government and School District Fiscal Accountability Act ("Public Act 4") to ensure the financial accountability of local governments and to provide services for the health, safety, and welfare of citizens. Under Public Act 4, the Governor appointed Michael Brown as Flint's Emergency Manager—with the attendant authority to modify collective bargaining agreements and contracts in order to "rectify the financial emergency." Public

Act 4 was subsequently repealed by referendum, and Edward Kurtz became the new Emergency Manager. Kurtz later appointed Brown as the City Administrator of Flint. Although the Act was repealed, Defendants seek to enforce the actions taken by Brown when he acted as the Emergency Manager under Public Act 4.

There is little doubt that Flint faces a serious financial emergency and is, in effect, under state receivership. In 2011, the City had a cumulative deficit of $25.7 million. Michigan law, however, requires that local governments operate under a balanced budget. As a result, local officials are faced with the formidable task of reducing the City's accumulated deficit.

For fiscal year 2013, Brown proposed that Flint balance its budget in a single year. To accomplish this, Gerald Ambrose, Flint's Financial Director, provided deposition testimony that reducing the deficit would require the City to reduce its work force by 115 positions, implement a twenty percent salary reduction for other employees, and modify the City's pension and health-care plans. In addition to reducing expenditures, the City also adopted methods to increase revenues. For example, Flint raised the water and sewer rates, yielding approximately 15 million dollars; increased fees for garbage collection, netting approximately 1.5 million dollars; and imposed a street-light assessment, resulting in additional revenues of 2.85 million dollars. Despite these changes, the City has continued to experience a cash shortage.

Recognizing that more needed to be done, in 2012 Brown issued a series of orders modifying certain terms in collective bargaining agreements between Flint and Plaintiffs-retirees. Plaintiffs claim they are entitled to lifetime health-care benefits identical or comparable to the plans in effect at the time of their retirement. These benefits are secured by collective bargaining agreements, other

contracts, ordinances, and past practices. The orders reshape Plaintiffs' contractual expectations in several ways. First, the City will no longer provide health-care coverage for a retiree's spouse if the spouse is eligible to receive paid coverage through a current or former employer. Second, the modifications limit all active and retired employees to three insurance providers, as opposed to the twenty different health insurance plans available before the changes. Defendants believe this consolidation will save the City $7,874,152 annually, although it also shifts costs to Plaintiffs by increasing deductibles, co-payments, and coinsurance. Under all three plans, Plaintiffs will be forced to pay a minimum of $500 and a maximum of $2,000 in out-of-pocket expenses before any insurance coverage begins. Retirees will also have to cover twenty percent of the costs of their health-care, out-of-pocket, even after the deductibles have been paid. Finally, the changes mandate that retirees and their eligible spouses aged sixty-five and over enroll in, and pay for, Medicare Supplemental Part B. This modification requires Plaintiffs to pay an additional $100 per person, per month.

Plaintiffs claim they are unable to pay for Medicare and health-care premiums because they live on fixed incomes. If Defendants are not preliminarily enjoined, Plaintiffs fear they will have to sacrifice basic necessities as a result of the increased co-pays and deductibles. For Plaintiff Judith Welch, the modifications require her and her spouse to purchase Medicare Part B at an additional cost of $200 per month. Welch also claims that as a result of the modifications, she will no longer be able to visit the physician who has been treating her for the past thirty years.

With over 1,000 municipal retirees, Defendants argue that if health-care benefits are not modified, the City would have to find another way to reduce expenditures immediately by 3.5 million dollars because there are no alternative revenue sources.

Defendants caution that curtailing public safety personnel would be imprudent and ultimately detrimental to the City's residents. Numerous accounts have underscored the violence in Flint. The City was recently ranked as "the number one most violent city in the nation," it was rated number six on a list of "America's most violent cities for women," and it was ranked number one on the FBI's 2011 List of Most Violent Cities with Populations over 100,000 persons. At this point, reductions have not been made to the Public Safety budget. But if the City maintains its current level of retiree health-care coverage, Defendants predict that it would be "impossible" to sustain police and fire services because public safety consumes about 70 percent of the City's general fund budget.

## II. PROCEDURAL HISTORY

On August 29, 2012, Plaintiffs moved for a temporary restraining order and a preliminary injunction to preclude modifications of their health-care plans from taking effect. In lieu of an evidentiary hearing, the parties submitted depositions and other documentary evidence. Based on this paper record, on March 29, 2013, the district court granted Plaintiffs' motion for a preliminary injunction.

Defendants then moved to stay the injunction pending appeal, and the district court denied their motion. After Defendants requested a stay on July 2, 2013, a panel of this court stayed the

preliminary injunction pending the outcome of the instant appeal. Defendants thereupon appealed the district court's order enjoining the Emergency Manager's modifications from taking effect. We have jurisdiction to review the district court's decision under 28 U.S.C. § 1292(a)(1).

## III. ANALYSIS

### A. Standard of Review

A "district court's findings of fact underlying its decision to grant a preliminary injunction are reviewed for clear error and the legal conclusions underpinning its decision are reviewed de novo." *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 858 (6th Cir. 1992). A factual finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). The district court's ultimate decision to grant a preliminary injunction is accorded significant deference and examined under the "highly deferential" abuse of discretion standard. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Accordingly, a decision may be disturbed only if the district court "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). Only in the "rarest of cases" should a district court's evaluation of the equities be disrupted on appeal. *NAACP v. City of Mansfield*, 866 F.2d 162, 166 (6th Cir. 1989).

### B. Preliminary Injunction Standard

A preliminary injunction is an extraordinary remedy that should be granted only if the movant establishes that the circumstances clearly demand it. *Leary*, 228 F.3d at 739. To determine whether an injunction is appropriate, a trial court must consider "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). These considerations are "factors to be balanced, not prerequisites that must be met." *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994).

## C. The Emergency Manager's Orders are an Exercise of Legislative Power

Plaintiffs claim that Defendants violated the Contract Clause of the U.S. Constitution because the modifications impair provisions of their contracts and collective bargaining agreements. The district court did not abuse its discretion in finding that this argument has a likelihood of success on the merits.

The Contract Clause provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl.1. In interpreting this clause, the Supreme Court has recognized the "high value" the Framers placed on protecting private contracts. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978). Case law also makes clear that this "prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934). Although citizens have the right to order their affairs by contract, states must be allowed to carry out "essential attributes

of sovereign power" to safeguard their citizens. *Linton by Arnold v. Comm'r of Health & Env't*, 65 F.3d 508, 517 (6th Cir. 1995) (internal quotation marks omitted). Before addressing the merits of Plaintiffs' Contract Clause claim, we must, as a threshold matter, examine whether the Emergency Manager's orders constitute an exercise of legislative authority. If not, the Contract Clause is not implicated.

A cause of action under the Contract Clause must be based on legislative acts because "the prohibition [against the impairment of contracts] is aimed at the legislative power of the state, and not at the decisions of its courts, or the acts of administrative or executive boards or officers, or the doings of corporations or individuals." *Ross v. Oregon*, 227 U.S. 150, 162 (1913). In *Ross*, the Supreme Court explained that the Contract Clause reaches "every form in which the legislative power is exerted, whether it be a constitution, a constitutional amendment, an enactment of the legislature, a by-law or ordinance of a municipal corporation, or a regulation *or order of some other instrumentality* of the state exercising delegated legislative authority." *Id.* at 163 (emphasis added). "Whether actions are, in law and fact, an exercise of legislative power depends not on their form but upon 'whether they contain matter which is properly to be regarded as legislative in its character and effect.'" *INS v. Chadha*, 462 U.S. 919, 952 (1983) (discussing Congressional action) (citation omitted). With this content-based inquiry in mind, this court has specified that municipal resolutions can be considered legislative acts. *See Wojcik v. City of Romulus*, 257 F.3d 600, 612 (6th Cir. 2001).

Defendants reject the district court's characterization of the Emergency Manager's orders as legislative acts, arguing that Brown merely applied a law enacted by the Michigan Legislature. To support this argument, Defendants rely on *City of Pontiac Retired Emps. v. Schimmel*, in which

the district court held that an Emergency Manager's actions were not "legislative action" because he failed to enact any laws. No. 12-12830, 2012 WL 2917311, at *5 (E.D. Mich. July 17, 2012). However, this decision has since been reversed and remanded by the Sixth Circuit, albeit on different grounds. *City of Pontiac Retired Emp. Ass'n v. Schimmel*, 726 F.3d 767 (6th Cir. 2013) (Griffin, J., dissenting). Importantly, because we did not confront directly whether an Emergency Manager's actions are an exercise of legislative power, it is questionable what weight, if any, to place on the district court's decision in *City of Pontiac*.

In our view, the terms of Public Act 4 make clear that the orders are an exercise of legislative power. Under the Act, the Emergency Manager had the facially unlimited authority to

> reject, modify, or terminate 1 or more terms and conditions of an existing collective bargaining agreement. The rejection, modification or termination of 1 or more terms and conditions of an existing collective bargaining agreement under this subdivision is a *legitimate exercise of the state's sovereign powers* if the emergency manager and the state treasurer determine that [certain] conditions are satisfied . . . .

Mich. Comp. Laws § 141.1519(1)(k) (emphasis added). The Act gave the Emergency Manager the ability to adopt or amend ordinances and exercise any power "relating to the operation of the local government." M.C.L. § 141.1519(1)(dd)-(ee). The Act also provided the Emergency Manager with expansive authority to act "in place of local officials, specifically the Mayor and City Council." The Emergency Manager, just like the City Council, had legislative powers to pass ordinances and appropriate funds, it is therefore reasonable to construe the Emergency Manager's actions as "legislative" because he had been delegated identical responsibilities under the Act.

The district court explained that Brown did not merely enforce already-existing laws. To the contrary, the authority to repeal and enact new municipal ordinances, according to the court,

sufficiently establishes an exercise of legislative power. We conclude that the character and effect of the challenged orders are properly understood as legislative because Public Act 4 explicitly contemplates that the Emergency Manager's orders will carry the force of the state's sovereign powers.

### D.      Likelihood of Success on the Merits

With this foundational question addressed, we now consider whether Plaintiffs are likely to succeed on the merits of their Contract Clause claim. To establish a strong likelihood of success on the merits, the moving party is not "required to prove his case in full . . . ." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Instead, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997).

The Supreme Court's framework for evaluating contract impairment claims involves a three-prong analysis. *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12 (1983). Courts must determine (1) whether a plaintiff has established "a substantial impairment" of a contractual relationship, (2) whether the state has a "significant and legitimate public purpose behind the regulation" such as the "remedying of a broad and general social or economic problem,"

and (3) whether the impairment is reasonable and necessary to serve that purpose. *Id*; *United States Trust Co. of NY v. New Jersey*, 431 U.S. 1, 25 (1977). We examine each consideration in turn.

### 1. Substantial Impairment

For a substantial impairment to exist, there must be a contractual relationship and a change in law that substantially impairs that relationship.[1] *Wojcik*, 257 F.3d at 612. The record before the district court indicates that the modifications will impose a "severe strain" on Plaintiffs by requiring them to pay significant amounts for Medicare and health-care premiums. In making its factual determinations, the court relied on affidavits and depositions describing how the changes impact Plaintiffs' access to medical care.

To begin, most of the Plaintiffs live on fixed incomes, and the proposed changes are material given the increases in co-pays and deductibles the retirees must pay. Plaintiff John Welch and his wife have approximately $440 remaining at the end of each month after paying their expenses. Because his pension and Social Security benefits are fixed, Welch doubts that he will be able to afford the new costs associated with his medical treatment. He explained, "[I]t's going to cost $1,000 for me and $1,000 for my wife for the copay. Plus, out of our Social Security, it's going to cost me a hundred dollars and her a hundred dollars . . . . I don't have that much money coming in."

---

[1] The original contracts and collective bargaining agreements were not included in the record before the district court or on appeal. According to Plaintiffs, Defendants did not contest the existence of the contracts until the parties reached the appellate level. During oral argument, however, Defendants admitted that, when evaluating the likelihood of success on the merits, we should examine Public Act 4 and the constitutional analysis required by the Contract Clause, rather than specific terms in the contracts and collective bargaining agreements. Since the existence of the contracts was not disputed in the proceedings below, we must analyze Plaintiffs' Contract Clause claim without the benefit of reviewing the initial agreements.

Additionally, limiting health-care coverage to three plans will prevent several Plaintiffs from visiting their long-term physicians who do not accept the new insurance coverage. Defendants' alterations also eliminate health-care coverage for retirees' spouses who are eligible for alternative insurance benefits, without regard to the cost of those benefits.

Defendants' argument that the plan is "temporary" and "subject to review and renewal" does not negate a finding that the modifications arguably place a severe burden on Plaintiffs' finances and access to medical care. "[T]otal destruction of contractual expectations is not necessary for a finding of substantial impairment," and even a short-lived impairment can work substantial injury to one's contractual interests. *Energy Reserves*, 459 U.S. at 411. Here, Plaintiffs' depositions and affidavits provide a sufficient factual basis for the district court's conclusion. The court's factual findings were not clearly erroneous.

*2. Significant and Legitimate Public Purpose*

Having determined that the orders substantially impair Plaintiffs' contracts, the burden shifts to the state to articulate "a significant and legitimate public purpose for the regulation . . . ." *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 323 (6th Cir. 1998). A legitimate public purpose is one that addresses an important social or general economic problem, as opposed to providing a benefit to special interests. *Energy Reserves*, 459 U.S. at 412. Several courts have recognized that addressing a fiscal emergency is a legitimate public purpose. *See, e.g.*, *Home Bldg. & Loan Ass'n*, 290 U.S. at 444–48; *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 369 (2d Cir. 2006). We agree.

The orders implemented in this case were part of a larger plan to remedy Flint's dire financial situation. In a 2012 letter to Michigan's State Treasurer, which is part of the district court

record, the Emergency Manager explained that modifying the collective bargaining agreements is designed to "address the financial emergency for the benefit of the public as a whole." The district court ultimately recognized two public purposes for the impairments made to Plaintiffs' contracts: to avoid bankruptcy and to achieve a balanced budget. Defendants have articulated a legitimate public objective, as the record plainly reveals that Flint is in financial turmoil. Moreover, municipal action to remedy a fiscal emergency satisfies the public purpose inquiry. *Buffalo Teachers Fed'n*, 464 F.3d at 369.

### 3. Necessary and Reasonable

The last consideration under the Contract Clause requires us to examine whether the orders were reasonable and necessary to serve a legitimate public purpose. *See, e.g.*, *Mascio v. Public Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 313 (6th Cir. 1998) (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242–44 (1978)). Impairing a contract is not necessary if "a less drastic modification" would have allowed the contract to remain in place. *United States Trust Co.*, 431 U.S. at 25, 30. The Supreme Court has admonished that "a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *Id*. at 31. In any event, any impairment must be reasonable under the circumstances. *Id*.

Under the Contract Clause, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *Id*. at 26; *see also Toledo Area AFL-CIO Council*, 154 F.3d at 325. Although complete deference is inappropriate, courts should confer some respect on a state's judgment that certain legislative actions are unavoidable. *Local Div 589, Amalgamated Transit Union v. Mass.*, 666 F.2d 618, 643 (1st Cir.

1981) ("[W]here economic or social legislation is at issue, some deference to the legislature's judgment is surely called for.")  In short, careful scrutiny should be applied to a state's justification for impairing contract rights when its own self-interest is at stake.  *Toledo Area AFL-CIO Council*, 154 F.3d at 325.

Defendants' primary argument boils down to this: to avoid bankruptcy, it had two options—reduce the Public Safety budget or reduce retiree benefits.  However, the record does not establish that bankruptcy was imminent, nor does it show that Defendants contemplated filing for bankruptcy.  By extension, the record also fails to demonstrate that Defendants considered alternative strategies before modifying retiree benefits.  Plaintiffs echo this sentiment, arguing that the City could have used municipal securities, among other alternatives, to pay for retiree health-care coverage.  Although Defendants insist that the "only viable option" to restore fiscal order is to modify retiree health-care benefits, the record does not support their argument.

The district court concluded that altering Plaintiffs' health-care benefits was not reasonably necessary to avoid bankruptcy and balance the City's budget.  Unable to find evidence in the record indicating that Flint considered or was facing bankruptcy, the court held that reducing contractual benefits was not necessary to meet the stated purpose of avoiding bankruptcy.  The court observed that Flint had been operating at a deficit since at least 2007 and had not entered bankruptcy.  In addition, the City's general fund deficit decreased from $14 million in 2010 to approximately $11 million in 2012.  The court further questioned why Defendants planned to eliminate the $25.7 million budget deficit in a single year, when a less drastic change might have allowed the contracts and collective bargaining agreements to remain unimpaired.  Without evidence that Defendants

attempted a more moderate course before modifying health-care benefits, the district court explained that "Defendants cannot simply foreclose other options, such as an additional millage or increased sewer and water fees . . . and use said foreclosure as a reason to abrogate duly-bargained for contracts." The district court did not abuse its discretion in so holding.

As it stands, Plaintiffs raise "serious, substantial [and] difficult" questions with regard to the reasonableness and necessity of the Defendants' actions, which render these issues "a fair ground for litigation and thus for more deliberate investigation." *Cafcomp Sys.*, 119 F.3d at 402. We acknowledge that courts are not in the best position to assess the prudence of one policy decision over another. *Blaisdell*, 290 U.S. at 447–48 ("Whether legislation is wise or unwise as a matter of policy is a question with which we are not concerned."). Though the wisdom of policy decisions is beyond the realm of the courts, assessing the *reasonableness* of Defendants' actions is required under the Contract Clause. Additional fact-finding may illuminate whether the orders were indeed appropriate under the circumstances of this case. But in light of the deferential standard of review and given the evidentiary support for the district court's decision, it cannot be said that the court abused its discretion in finding that Plaintiffs established a likelihood of success on the merits.

**E.      Irreparable Harm**

To obtain preliminary injunctive relief, Plaintiffs must also demonstrate irreparable harm that is "both certain and immediate, rather than speculative or theoretical." *NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 943 (6th Cir. 2007). This court has held that "harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d

566, 578 (6th Cir. 2002). With respect to the type of harm at issue here, "[n]umerous courts have found that reductions in retiree insurance coverage constitute irreparable harm." *Golden v. Kelsey-Hayes*, 845 F. Supp. 410, 415 (E.D. Mich. 1994) (citing *United Steelworkers of Am.*, *AFL-CIO v. Textron, Inc*., 836 F.2d 6, 8 (1st Cir. 1987) ("[R]etirees as a group have less resources and are more vulnerable to emotional distress due to the imposition of additional insurance costs."); *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261, 1267–68 (W.D. Mich. 1990) ("[B]ecause retirees live on fixed incomes, small increases in expenses create extreme financial hardship; they are more likely to suffer uncertainty and worry over the new costs associated with the modified plan."), *aff'd*, 948 F.2d 1290 (6th Cir. 1991); *Mamula v. Satralloy Inc*., 578 F. Supp. 563, 577 (S.D. Ohio 1983)). The district court was not mistaken in finding irreparable harm to Plaintiffs, absent injunctive relief.

In *Golden v. Kelsey-Hayes*, a federal district court held that retirees demonstrated irreparable harm because, without an injunction, they would be forced to choose between paying for needed medical care and paying for basic necessities. *Golden*, 845 F. Supp. at 415. Like the retirees in *Golden*, Plaintiffs are likely to suffer non-compensable harm as a result of Defendants changing their contracts and collective bargaining agreements. Plaintiffs have submitted three affidavits, describing how the modifications will affect their finances and ability to access specific medical treatments. For example, Plaintiff Carolyn Sparks averred that after the changes are implemented, she and her husband will no longer be able to afford all of their prescribed medications. If Defendants alter her contract by requiring her to purchase Medicare Part B at an additional cost of $198.00 per month, or pay increased deductibles of $1,000 per person, per year, these additional expenses will cause Sparks to have to either "forgo necessary medical care or give up basic necessities."

John Welch testified that he and his spouse have been patients of the same physician for the past thirty years. Under the modifications, his new insurance will not be accepted by his personal physician and he will have to change doctors. Welch suffered a heart attack in 1996, had open heart surgery, and underwent four bypasses. To monitor his condition, he has stress tests conducted once a year and also sees a cardiologist. Welch testified that this treatment is no longer a covered benefit.

Defendants reject Plaintiffs' irreparable harm argument, suggesting that they have an adequate remedy at law—namely, money damages. The injury Plaintiffs experienced is not irreparable, according to Defendants, because the modifications actually provide Plaintiffs with greater benefits than they had when they retired. Even assuming that Plaintiffs may have access to more services, altering their coverage will likely cause a significant interference in care. While money damages would provide Plaintiffs with the resources to afford the increased deductibles and co-pays after the fact, this remedy fails to make Plaintiffs whole for the interim inability to access care.

In totality, the affidavits and testimony in this case indicate that Plaintiffs' medical treatment may be interrupted by Defendants' modifications, and such a disruption in care constitutes irreparable harm. *See Golden*, 845 F. Supp. at 415. The district court's finding on this issue was not clearly incorrect because the record shows that Plaintiffs' access to medical care may be compromised. Therefore, we are not "left with the definite and firm conviction" that the court erred in finding irreparable harm. *Gypsum Co.*, 333 U.S. at 395.

## F.    Harm to Others/Public Interest

The remaining factors to consider are whether granting preliminary injunctive relief will cause substantial harm to others and whether the injunction is in the public interest. The district court concluded that a preliminary injunction would not cause harm to third parties and that the public interest "weighed in favor of ensuring continuing health care to members of the public." Unconvinced by Defendants' claim that without the injunction they would have to make cuts that would negatively affect the City's public safety, the court theorized that the City had other options to balance its budget. The district court also reasoned that issuing a preliminary injunction was in the public interest because it ensures that retirees will not suffer harm because of a lack of medical care. Defendants argue that the district court did not give proper weight to the evidence concerning harm to others. If preliminarily enjoined, Defendants claim they will be forced to reduce the Public Safety budget because all other departments have already received significant reductions. This potential reduction, according to Defendants, could threaten the ability of police officers and firefighters to prevent and respond to community safety problems.

Trimming the Public Safety budget may cause an increase in violence; however, the applicable standard of review is not "whether *we* would grant a preliminary injunction if we were acting in the place of the district court . . . ." *Leary*, 228 F.3d at 739 (emphasis added). Certainly, there are factors favoring Plaintiffs on one hand and the City of Flint on the other. But given the closeness of the questions presented and after balancing the various considerations, the district court did not abuse its discretion by issuing a preliminary injunction. Presumably, additional evidence will be adduced at trial, but our narrow task is to review the district court's decision to preserve the

relative positions of the parties until a hearing or trial on the merits can be held.  This remedy has not been shown to be unwarranted in the present case.

Because we affirm the district court's award of a preliminary injunction based on the Contract Clause, we need not examine Plaintiffs' Due Process or Bankruptcy Clause arguments.

## IV.  CONCLUSION

For the reasons stated above, we affirm the district court's decision granting Plaintiffs' motion for a preliminary injunction.